IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| TONY A. YEARY, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No.: 1:14-cv-719 |
| ) | |
| UNITED STATES OF AMERICA ) | |
| DEPARTMENT OF VETERANS AFFAIRS ) | |
| VETERANS HEALTH ADMINISTRATION, ) | |
| ) | |
| Defendant. ) | |

## **COMPLAINT FOR DAMAGES & DEMAND FOR TRIAL BY JURY**

The plaintiff, Tony A. Yeary ("*Mr. Yeary*"), for his complaint for damages against the defendant, United States of America Department of Veterans Affairs Veterans Health Administration (the "*VA*"), states:

## **PARTIES**

1. Mr. Yeary is an individual domiciled and residing in Indianapolis, Indiana. Mr. Yeary is a Veteran of the United States Marines.

2. The VA is the country's largest integrated health care system responsible for the healthcare needs of millions of United States Veterans.

3. At all times relevant to this complaint, Nick Wei-En Liu, M.D. ("*Dr. Liu*"), was employed by the VA as a medical resident at the Richard L. Roudebush VA Medical Center, located at 1481 West 10th Street in Indianapolis, Indiana (the "*Hospital*").

4. At all times relevant to this complaint, Rahul Dev Mehan, M.D. ("*Dr. Mehan*") was employed by the VA as a medical resident at the Hospital.

## JURISDICTION AND VENUE

5. This Court has jurisdiction over this complaint under the Federal Tort Claims Act, 28 U.S.C. § 2671, *et seq.*, because the complaint states claims for monetary compensation as a result of injuries suffered by Mr. Yeary from the acts of VA employees acting within the scope of their employment.

6. Venue is proper in the Southern District of Indiana pursuant to 28 U.S.C. § 1346, because Defendant's liability arises as a result of the actions of Dr. Liu, Dr. Mehan, and other staff at the Hospital, located in Indianapolis, Indiana.

## FACTUAL BACKGROUND

### *The May 10, 2012 Procedure*

7. On May 10, 2012, Mr. Yeary checked into the Urology Clinic at the Hospital for an examination by cystoscopy due to a decreased and weakening urine flow.

8. Dr. Liu, a resident at the Hospital, commenced the procedure by insertion of the cystoscope into Mr. Yeary's penis. Almost immediately, a stricture prior to the prostate was visible.

9. At this point in the procedure, Dr. Liu should have discontinued the examination. Instead, he decided to proceed.

10. Mr. Yeary asked whether the procedure should be discontinued, but Dr. Liu assured him he could insert a catheter very quickly and that he wanted to view further up the urinary tract.

11. Dr. Liu then forcefully worked to get the cystoscope past the stricture by repeatedly jabbing the instrument into the urinary tract, causing tearing and severe pain.

12. Mr. Yeary only had a small amount of local anesthesia to the tip of his penis, and felt excruciating pain.

13. Dr. Liu finally determined that he could not get the cystoscope past the stricture, so he started feeding a small wire up Mr. Yeary's urinary tract.

14. After several jabs, Dr. Liu got the wire past the first stricture only to encounter a second stricture.

15. At this point, Mr. Yeary's urinary tract was so damaged and bleeding that, according to Dr. Liu, a catheter had to be inserted or Mr. Yeary would have to undergo emergency surgery.

16. Dr. Liu assured Mr. Yeary he could get a catheter in very quickly and that the pain would not last long.

17. Despite these assurances, it took multiple attempts for Dr. Liu to get the wire to pass through the remainder of the urinary tract and into the bladder.

18. Dr. Liu then commenced his attempts to insert dilators to open the strictures to create a large enough passage for a catheter.

19. Dr. Liu continued to jab and push, causing excruciating pain. Eventually, Dr. Mehan joined Dr. Liu to assist with the procedure.

20. Both physicians then continued their attempts to force the dilators into Mr. Yeary. At one point, sweating profusely, Dr. Liu commented to Dr. Mehan, "this is the Cadillac of dilations."

21. Finally, after over an hour and a half, a size 12 Foley catheter was successfully placed.

22. Dr. Liu informed Mr. Yeary that he would prescribe pain medications and antibiotics, and left.

23. Mr. Yeary was left alone in the room, laying in urine and blood. No one returned to assist him, and he was never provided with any medications or prescriptions.

24. After a considerable period of time, Mr. Yeary was able to get up, knock on a door, and request something with which to clean himself. Mr. Yeary then returned home.

25. Later that evening, Mr. Yeary was in such intolerable pain that he had to return to the emergency room of the Hospital.

26. The physician who saw Mr. Yeary ordered a urinalysis and a pain medication injection.

27. After giving the urine sample and receiving the injection, Mr. Yeary informed the nurse he wanted to go home and lie down and to return in the morning for follow-up. He was told that would be fine, so he left.

28. The next morning, Dr. Liu called Mr. Yeary and admitted he had forgotten to prescribe any medications.

29. Dr. Liu told Mr. Yeary he would order the medications which could be picked up in the morning.

30. When Mr. Yeary arrived at the Hospital, however, there still were no medications prescribed for him.

31. Finally, a nurse practitioner took steps to make sure Mr. Yeary received the appropriate medications.

32. The VA breached the applicable standard of care in the treatment of Mr. Yeary on May 10, 2012, resulting in severe pain, suffering, and permanent injuries.

### *The June 15, 2012 Procedure*

33. On June 15, 2012, Mr. Yeary checked into the Hospital for surgery to address the strictures in his urethra and bladder neck contracture.

34. Upon arrival, Mr. Yeary was seen by Dr. Mehan.

35. Dr. Mehan explained the procedure to be performed and asked if Mr. Yeary had any questions.

36. Mr. Yeary asked who was going to perform the surgery. Dr. Mehan advised that he would be performing the surgery.

37. Mr. Yeary asked if anyone else would be touching him during the procedure, to which Dr. Mehan responded "No. I am going to do it. I am very good at this procedure. You have nothing to worry about."

38. Mr. Yeary then informed Dr. Mehan emphatically that he did not want Dr. Liu to touch him, *i.e.*, did not want Dr. Liu to perform any procedures on him.

39. Dr. Mehan again assured Mr. Yeary that he (Dr. Mehan) would be the physician performing the procedure, and not Dr. Liu.

40. Mr. Yeary's cousin was present for and witnessed this entire conversation.

41. After receiving repeated assurances that only Dr. Mehan, and not Dr. Liu, would perform the procedure, Mr. Yeary signed a consent form and was taken to the operating room.

42. When Mr. Yeary awoke in recovery, he found a nurse and Dr. Liu standing at his bedside. Dr. Liu asked if Mr. Yeary was in any pain.

43. Mr. Yeary said he was in pain, and asked "why?"

44. Dr. Liu then stated that he had had a problem during the surgery.

45. Mr. Yeary asked "<u>You</u> had a problem?"

46. Dr. Liu then admitted that he had been the one who performed the procedure, that unbeknownst to him the guide-wire he had inserted in Mr. Yeary's bladder had come out, and that when Dr. Liu proceeded to insert a dilator, he punctured Mr. Yeary's prostate and possibly his rectum.

47. Dr. Liu informed Mr. Yeary that he would be required to stay in the Hospital for three (3) nights so that they could monitor him for signs of infection resulting from a puncture of the rectum.

48. Mr. Yeary was understandably quite angry, and stated, "You f***ed up." In response, Dr. Liu stated "I f***ed up."

49. Mr. Yeary expressly directed that Dr. Liu not be permitted to perform any surgical procedures on him and such direction was a condition of Mr. Yeary's execution of the written consent form.

50. The VA never obtained Mr. Yeary's consent, informed or otherwise, for the surgical procedures performed on Mr. Yeary by Dr. Liu.

51. The VA, through Drs. Liu and Mehan, committed a medical battery upon Mr. Yeary.

52. The VA also breached the applicable standard of care in the treatment of Mr. Yeary on June 15, 2012, resulting in severe pain, suffering, and permanent injuries.

53. As a result of the VA's wrongful actions, Mr. Yeary suffers from permanent scarring and damage, continuing pain and suffering, and urinary incontinence, significantly impairing Mr. Yeary's quality of life.

54. Mr. Yeary has obtained outside consultation and treatment by another physician at the IU Health Department of Urology in Indianapolis, Indiana.

55. Mr. Yeary's injuries are so significant and permanent, he has been advised that he will require a procedure known as an appendicovesicostomy—a procedure pursuant to which a patient's appendix is used to create a stoma on the patient's abdomen through which a catheter may be placed to drain the bladder.

*The Administrative Claim*

56. On July 31, 2012, Mr. Yeary, *pro se*, filed an administrative claim for damages with the Department of Veterans Affairs (the "*VA*").

57. On December 18, 2012, the VA administratively denied the claim, concluding that there was no negligent or wrongful act on the part of an employee of the VA acting within the scope of his or her employment.

58. On June 14, 2013, Mr. Yeary, by counsel, filed a formal request for reconsideration.

59. More than six (6) months have elapsed since the filing of the request for reconsideration, and the VA has not issued a final disposition of the request.

60. Pursuant to 28 U.S.C. §2675(a), Mr. Yeary is therefore entitled to file this complaint.

## **DEMAND FOR TRIAL BY JURY**

The plaintiff, Tony A. Yeary, respectfully demands a trial by jury in this case.

WHEREFORE, Tony A. Yeary respectfully requests that the Court enter judgment in his favor and against the defendant, the United States of America Department of Veterans Affairs Veterans Health Administration, awarding such damages as are reasonable to fully and fairly compensate him for all losses, injuries, and damages, for the costs of this action, and for all other relief just and proper in the premises.

Respectfully submitted,

ROBERGELAW

By: */s/ Christopher S. Roberge*

ROBERGELAW
The Regents Building
12775 Horseferry Road, Suite 200
Carmel, Indiana 46032
Telephone: (317) 818-5500
Facsimile: (317) 818-5510

Christopher S. Roberge (#6413-98)
Elizabeth A. Roberge (#17139-49)
Anelia T.N. Ray (#26900-06)
*Attorneys for Tony A. Yeary*